Paul Gattone
Arizona Bar # 012482
Law Office of Paul Gattone
301 S. Convent
Tucson, AZ 85701
gattonecivilrightslaw@gmail.com
(520) 623-1922
*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| Community on Wheels, an unincorporated association; Community Care Tucson, an unincorporated association; People's Defense Initiative, an Arizona nonprofit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>City of Tucson,<br><br>Defendant. | Case No. _____<br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

### **INTRODUCTION**

1. "The law, in its majestic equality, forbids rich and poor alike to sleep under bridges, to beg in the streets, and to steal their bread." - Anatole France

2. This action challenges the City of Tucson's anticipated efforts to hide the region's unhoused population from public view by trespassing them from public parks in the coming weeks. Plaintiffs contend that the Constitution forbids the City from doing

1

this so long as the estimated number of houseless individuals in the metropolitan area exceeds the bed capacity found in the region's various low-barrier, emergency homeless shelters.

## JURISDICTION AND VENUE

1. This court has subject-matter jurisdiction under 42 U.S.C. § 1983; 28 U.S.C. §§ 1331, 1343; and the Eighth & Fourteenth Amendments to the U.S. Constitution.

2. The unincorporated association plaintiffs have capacity to sue pursuant to Fed. R. Civ. P. 17(b)(3)(A), as they are each a group of persons, without a charter, formed by mutual consent for the purpose of promoting a common objective.

3. This court has jurisdiction under 28 U.S.C. § 2201 to declare the rights of the respective parties.

4. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred in Pima County and the sole defendant is found in Pima County.

## PARTIES

5. Plaintiff Community on Wheels is an unincorporated association that operates in Tucson with the charitable objective of providing essential items for unsheltered individuals and advocating for humane local policies surrounding homelessness.

6. Plaintiff Community on Wheels was formed in 2020 in response to rising housing insecurity in the Tucson community. Individual members of Community on Wheels

joined together by mutual consent for the purpose of mutual-aid and to provide for unsheltered community members.

7. Plaintiff Community Cares Tucson is an unincorporated association that operates in Tucson with the charitable objective of providing free meals to unsheltered individuals and advocating for humane local policies surrounding homelessness.

8. Plaintiff Community Care Tucson was formed in 2020 in response to rising housing insecurity in the Tucson community. Individual members of Community Care Tucson joined together by mutual consent for the purpose of mutual-aid and to provide for unsheltered community members.

9. Plaintiff People's Defense Initiative ("PDI") is an Arizona nonprofit organization, incorporated in 2018.

10. PDI operates the Tucson Tenant's Union, a membership-based, tenant-led movement that advocates for safe and secure housing as a human right.

11. The Tucson Tenant's Union defines eligibility for membership as anyone who is not in control of their own housing. As defined by the Tucson Tenant's Union, this includes those who are renters *and* those who are unhoused. The Tucson Tenant's Union currently has active members who are unhoused and living in the city limits of Tucson. Consequently, several of Tucson Tenant Union's individual members would have individual standing to raise the claims brought in this action.

12. The Tucson Tenant's Union frequently co-leads protests, outreach efforts, and direct service events on behalf of the unsheltered community.

13. Plaintiffs have a concrete stake in the outcome of this litigation. The two unincorporated plaintiffs assert organizational standing on the basis of diversion of resources. *See* Exhibits H & I. Plaintiff PDI asserts both organizational standing and representative standing on the basis that its Tucson Tenants Union is a membership organization whose individual members have a personal stake in the outcome of this litigation, as unsheltered individuals.

## FACTUAL ALLEGATIONS

### Tucson's Housing Crisis

14. In the years leading up to COVID-19, the Tucson area was already experiencing unprecedented rent increases. For example, in 2016, Tucson was deemed a "Top 25 evicting city" by Princeton University's Eviction Lab, which tracks eviction court data throughout the country.

15. Today, this pre-pandemic trend continues in more dramatic fashion. By some calculations, average Tucson rents have increased 30% since early 2020.

16. Rent increases lead to evictions. In 2022, approximately 12,000 evictions were filed in court. Upon information and belief, Pima County's 2022 figures will exceed the county's previous record, set in 2006.

17. There is no end in sight. The record-breaking 2022 eviction figures occurred as federal rental assistance was being doled out to thousands of low-income Tucson renters. Put differently, Tucsonans were evicted at record levels even though a

carefully-tailored government program existed for the express purpose of reducing evictions.

18. In Pima County, the federal rental assistance is ending this month. Low-income renters are no longer eligible to receive this assistance as they had been throughout 2022. Consequently, one can expect the 2023 evictions numbers to outstrip the 2022 figures.

**Tucson's Homelessness Crisis**

19. Increased evictions lead to increased homelessness.

20. In late January 2020, the federally-mandated Point-in-Time count estimated the number of homeless persons in Pima County to be 1,324. *See* Exhibit A.

21. In late January 2020, the number of emergency shelter beds in Pima County was estimated to be 705. *See* Exhibit A.

22. Thus, even before a global pandemic upended the housing market, there existed emergency shelter beds to meet only about half of the need in Pima County.

23. Today, the situation is far worse.

24. Since January 2020, the number of emergency shelter beds in Pima County has increased only incrementally. Meanwhile, the number of houseless individuals has skyrocketed.

25. In early February 2022, the annual Point-in-Time count placed the number of homeless persons in Pima County at 2,227. Based on these numbers, the homeless population doubled in just two years.[1] Exhibit B.

26. The 2,227 figure is the estimated number of individuals who slept in an emergency shelter, a transitional housing shelter, a vehicle, outside in the elements, or in a physical structure unfit for human habitation (such as a tool shed or abandoned building). This number does not include those who "couch surfed" in a friend's living room, "doubled up" with another family, or who were imminently about to be unsheltered thanks to an eviction order.

27. Today, the homeless population in Pima County is much larger than the 2,227 figure reported from one year ago.

28. For example, Pima County – in collaboration with the City of Tucson and other service agencies – maintains the Pima County Homeless Management Information System ("HMIS"). HMIS is a secure, cloud-based database that is shared among 50 public and private social service providers in the community. The employees of these service agencies have access to HMIS and are credentialed to input data into the system. Every day, medical providers, mental health professionals, social workers, case workers, counselors, law enforcement officers, educators, and emergency shelter

---

[1] A figure published by the Tucson Department of Housing and Community Development placed the number of homeless individuals at 1,660 in 2020, rather than 1,324. Using that number, homelessness increased at a slower pace between 2020 and 2022. Nevertheless, the conclusion remains the same: the number of homeless individuals in 2023 far exceeds the number of emergency shelter beds.

operators from these various agencies input information into HMIS when there is an interaction with a homeless individual. *See* Exhibit C.

29. Because HMIS collects personally-identifiable information, there is a low risk that the same homeless individual is counted more than once. Upon information and belief, HMIS has built-in mechanisms to flag two entries that are believed to be the same homeless individual. A key purpose of HMIS is to assist providers in tracking a given homeless client throughout their journey from homelessness to housing. Consequently, those who input information into HMIS have an incentive to ensure that duplicates are kept to a minimum.

30. Similarly, providers who input information into HMIS will note when a given individual obtains long-term housing. In this way, too, HMIS is the most accurate method source of homelessness figures. Because a service provider indicates in the computer database when a formerly-homeless individual acquires housing, that person is no longer counted toward the aggregate number.

31. During the first week of January 2023, HMIS counted approximately 3,000 unique individuals who were staying in an emergency shelter, a transitional shelter, a private vehicle, outside in the elements, or in a structure unfit for human habitation.

32. Upon information and belief, the 3,000 figure, cited above, does not include individuals who "couch surfed" in a friend's living room or families that "doubled up" with another family. Consequently, there is an unknown additional number of

Pima County residents who are dangerously close to falling into the unsheltered category at a moment's notice.

33. By other measurements, too, the number of houseless individuals outstrips the number of available shelter beds. For example, the Tucson Police Department has a dedicated Homeless Outreach Team, whose mission is to respond to nonemergency reports of unsheltered individuals. Upon information and belief, the Tucson Police Department Homeless Outreach Team consists of three full-time police officers. According to the unit's sergeant, the three-person team made contact with approximately 900 separate unsheltered individuals during a 6-month period in 2021. *See* Exhibit D.

34. Because the Tucson Police Department's Homeless Outreach Team has limited staffing and is designed to respond to reports of visible homelessness camps, the estimate provided by the police sergeant, above, represents only a fraction of the true number of unsheltered individuals living in open-air settings within Tucson city limits.

35. While the number of individuals experiencing homelessness hovers around 3,000 (based on the most recent HMIS numbers), the number of emergency shelter beds in Pima County is 859. *See* Exhibit E.

36. As of January 2023, Pima County has 20 low-barrier, emergency shelter locations. These range in size from a 6-bed facility operated by the Salvation Army to the 350-

bed facility operated by the Gospel Rescue Mission and housed in a former Radisson hotel. Combined, these 20 shelter sites provide a total of 859 beds. *See* Exhibit E.

37. Despite the rise in homelessness, the number of low-barrier, emergency shelter beds has declined in Pima County in recent years. In January 2016, for example, there were 981 emergency shelter beds in Pima County.

### Tucson's Anti-Camping & After-Hours Ordinances

38. The City of Tucson maintains two misdemeanor statutes that have the effect of punishing a houseless person's basic need for sleep and rest. As applied to involuntarily houseless individuals, these two ordinances violate the Eighth Amendment during any night in which there are a greater number of houseless individuals in the Tucson metropolitan area than there are emergency shelter beds. Put differently, these two statutes violate the Eighth Amendment during any night during which the total unsheltered population exceeds 859.

39. The first of these ordinances (referred to here as the "anti-camping ordinance") prohibits any person to: "camp, lodge, or sleep [in any city park] between the hours of 10:30pm and 6:00am unless special written permit be obtained seventy-two (72) hours in advance from the director [of the Department of Parks and Recreation]." Tucson City Code, Sec. 21-3(5); *see* Exhibit F.

40. Camping is defined broadly to mean: "the placement of any tent, temporary shelter or structure, blanket, cloth, or other sleeping implements on park property for the

purposes of protection from the elements for any persons remaining in the park." Tucson City Code, Sec. 21-1.

41. The second of these ordinances prohibits a person to "enter or remain in any park or park facility is posted as Closed to the Public." Tucson City Code, Sec. 21-3(7). This ordinance purports to authorize a peace officer to arrest or issue a citation to anyone found sleeping in a city park after hours.

42. Every city park has posted signs announcing the closing time of that particular park. No city park is open beyond 10:30pm.

43. Violations of both the anti-camping ordinance and the after-hours ordinance are misdemeanor offenses, punishable by up to six months in jail and a $1,000 fine. Tucson City Code, Sec. 21-7.

44. The anti-camping ordinance dates back to at least 2004.

45. Mayor and Council have not amended the anti-camping ordinance since the Ninth Circuit issued its seminal decision in *Martin v. City of Boise*, in 2018.

46. Since 2018 and continuing up to the present time, Tucson police officers have routinely issued criminal citations to houseless individuals who are alleged to be in violation of the anti-camping ordinance and/or the after-hours ordinance. *See* Exhibits G & H.

47. Tucson police officers will approach a houseless individual or group of individuals who are actively sleeping during the early-morning hours. Officers will arouse the houseless individuals from their sleep, alert them that they are not permitted to be at

the park, and issue a paper citation for a violation of the anti-camping ordinance. *See* Exhibits G & H.

48. Typically, the citation will be accompanied by a forced eviction from the park.

49. After a houseless individual is cited for either of these two offenses, it is common for the Tucson City Court to schedule an arraignment several weeks after the alleged offense. *See* Exhibit H.

50. If the houseless individual does not appear for their scheduled arraignment, a Failure to Appear ("FTA") warrant will issue for the person's arrest. Although the original police interaction may not have resulted in jail time, the issuance of a bench warrant increases the likelihood that the houseless individual will be physically arrested and transported to jail during a subsequent interaction with police. *See* Exhibit H.

51. In this way, even a seemingly innocuous 'cite and release' procedure results in a very real and tangible criminal punishment down the line.

52. As recently as November 2022, members of the Plaintiff associations have documented instances of Tucson police citing and releasing houseless individuals who were engaged in no criminal activity beyond the two challenged ordinances (and on nights in which there were more houseless than emergency shelter beds). *See* Exhibits G & H.

53. One such individual was cited under the After-Hours ordinance in late 2022, has an upcoming arraignment on that offense, and was found by a member of Plaintiff Community Cares Tucson in Santa Rita Park as recently as January 14, 2023.

Consequently, this individual is at imminent risk of being cited again for the same offense. Exhibit H.

54. While Plaintiffs contend that even *one* citation would amount to an Eighth Amendment violation, Defendants are expected to cite many more involuntarily houseless individuals in the weeks ahead.

55. For example, on or about January 13, 2023, members of the Plaintiff associations learned that the City of Tucson intends to sweep (ie, clear) Santa Rita Park of its houseless population and their personal belongings. Ostensibly, Defendants intend to complete such a sweep by January 28, 2023 – the first day of the annual Tucson Gem & Mineral Show, with several of its exhibit locations situated roughly ten blocks from Santa Rita Park. Exhibits H & I.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983
**Eighth Amendment: Cruel and Unusual Punishment and Excessive Fines**

56. The allegations above are incorporated by reference in this Count.

57. The Eighth Amendment to the United States Constitution prohibits municipalities from inflicting cruel and unusual punishment, and from imposing excessive fines.

58. The Eighth Amendment not only "prohibits the imposition of punishment grossly disproportionate to the severity of the crime, but also 'imposes substantive limits on

what can be made criminal.'" *Martin v. City of Boise*, 920 F.3d 584, 613 (9th Cir. 2019) (*quoting Ingraham v. Wright*, 430 U.S. 651, 667 (1977)).

59. Put differently, there are certain would-be offenses for which *any* penalty would violate the Eighth Amendment. For example, "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Robinson v. California*, 370 U.S. 660, 667 (1962). This is because a crime is not a crime unless the accused has voluntarily acted or refused to act.

60. The Ninth Circuit has warned of "the constitutionally significant danger of making status a surrogate for prohibited conduct." *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1478 (9th Cir. 1994).

61. The city may, consistent with the Eighth Amendment, prosecute an individual with ample means who simply chooses to sleep in a public park in contravention of a clearly-stated ordinance. The city may not prosecute an indigent individual for whom "the public streets may be home" and who "ha[s] no place else to go and no place else to be." To prosecute such a person would be to prosecute someone for whom "avoiding public places . . . is also impossible." *Powell v. Texas*, 392 U.S. 514, 550-51 (1968).

62. Laws that criminalize sleeping outside on public property implicate the protections of the Eighth Amendment when applied to an individual who is involuntarily homeless and truly has no other choice. *Martin v. City of Boise*, 920 F.3d 584, 617 (9th Cir. 2019).

63. This is because the acts of "sitting, sleeping, [and] lying" are "universal and unavoidable consequences of being human." An individual who "cannot obtain shelter" has no choice but to perform these tasks outside. Consequently, the act of sleeping on public property becomes "inseparable from status — they are one and the same, given that human beings are biologically compelled to rest" and a person who finds themselves involuntarily homeless is unable to sleep indoors. *Martin,* 920 F.3d at 616–17.

64. Plaintiffs acknowledge that some Tucson police officers have historically chosen to 'cite and release' a houseless individual for violating park regulations rather than arresting them in the traditional sense. A.R.S. § 13-3903 affords Arizona peace officers the option of doing so. But the cite and release procedure does not offer police officers an escape hatch from the Eighth Amendment. It does not transform an otherwise unconstitutional form of punishment into a permissible one. *See, e.g., Friendly House v. Whiting*, 2010 WL 11452277, at *16 (D. Ariz. Oct. 8, 2010) (observing that individuals who are cited and released under A.R.S. § 13-3903 "are technically 'arrested' but never booked into jail").

65. A city official cannot sidestep this Eighth Amendment principle by merely *threatening* to arrest or cite an individual suspected of illegally camping in a public park. An officer cannot, consistent with the Eighth Amendment, coerce an involuntarily houseless individual to "move along" to another location under the threat of arrest for a crime that the officer would be otherwise powerless to enforce.

66. Under this count, Plaintiffs are entitled to declaratory and injunctive relief.

## COUNT II
## 42 U.S.C. § 1983
## Fourteenth Amendment Procedural Due Process

67. The allegations above are incorporated by reference in this Count.

68. The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

69. Under that provision, "the government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008).

70. The property of those experiencing homelessness is "property" within the meaning of the Fourteenth Amendment, meaning a municipality "must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012).

71. Houseless individuals have a property interest in personal possessions that are left "momentarily unattended" in a public park or other public outdoor space. *Lavan*, 693 F.3d at 1024. Personal belongings may appear to be abandoned when left on the ground in a public park, but they are indeed "property" for purposes of the Due Process Clause unless a city official forms an objectively reasonable belief that the items are abandoned.

72. In determining whether a purported owner has a protected property interest in a given item, federal courts are guided by state law. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("[p]roperty interests, of course, are not created by the Constitution [but] . . . by existing rules or understandings that stem from an independent source such as state law.")

73. In Arizona, "tangible personal property" is defined as anything "that may be seen, weighed, measured, felt or touched or that is in any other manner perceptible to the senses." A.R.S. § 42-5001.

74. In Arizona, personal property is defined broadly to include "money, goods, chattels, things in action and evidences of debt." A.R.S. § 1-215.

75. Put differently, personal property "includes everything the subject of ownership not being land or any interest in land," *Burkett v. Mott by Maricopa Cnty. Pub. Fiduciary*, 152 Ariz. 476, 478 (Ct. App. 1986), including – for example – pets. *Kaufman v. Langhofer*, 223 Ariz. 249, 252 (Ct. App. 2009).

76. When a non-hazardous, momentarily-unattended piece of personal property is found on a parcel of land commonly known to serve as a place of rest for houseless individuals, it takes a lot for a city official to reasonably form the belief that the item was intended to be permanently abandoned by its owner.

77. This principle holds true, whether the parcel of land is a public park historically frequented by houseless individuals, a dry wash that has only recently developed into a *de facto* camp, or a drainage tunnel under a highway.

78. This principle holds true, even where city officials confiscate personal belongings in response to the property owner's alleged violation of a city ordinance. *Lavan*, 693 F.3d at 1029 (noting that if the city were permitted to destroy a houseless person's belongings without affording due process, it could just as easily "seize and destroy any illegally parked car or unlawfully unattended dog[.]")

79. When a city official removes a non-hazardous personal belonging and there is an objectively reasonable belief that the item was not permanently abandoned by its owner, the City must provide post-deprivation notice and an opportunity to be heard *before* destroying the item or discarding it in the landfill.

80. Here, Defendants have engaged and will continue to engage in sweeps that target the unsheltered community who spend their time on public land within the city.

81. Upon information and belief, Defendants have employed these tactics in recent years without adequate notice to houseless individuals.

82. During these instances, Defendants seized and destroyed property belonging to houseless individuals, without affording them adequate notice and pre-deprivation process.

83. For Tucson's houseless individuals rely on this personal property for survival. It is all they have. Compared with a houseless individual's extremely high interest in their property, any administrative burden on the City to provide additional process is low.

84. Upon information and belief, Defendants intend to seize the property of houseless individuals existing in public parks, without affording them a post-deprivation process for challenging the seizure of their property.

85. For example, upon information and belief, Defendants have no policy for the temporary storage of personal belongings seized during a park sweep. Without a policy or procedure for temporary storage of such belongings, there can be no post-deprivation process afforded to houseless individuals. This is because the belongings will have already been destroyed by the time a houseless individual avails themselves of any post-deprivation process articulated by the City.

86. Under this count, Plaintiff is entitled to declaratory and injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court grant them the following relief:

A. Preliminarily and permanently enjoin Defendant from:

    a. Arresting and/or issuing citations for violations of the anti-camping or after-hours ordinances, against those individuals who practically cannot obtain shelter because there are more unsheltered individuals in the Tucson metropolitan area than there are shelter beds available;

    b. Coercing houseless individuals to vacate public parks by threatening to cite such individuals under the anti-camping or after-hours ordinances, during those

        nights in which the number of houseless individuals exceeds the number of emergency shelter beds in the Tucson metropolitan area;

    c. Destroying non-hazardous, unabandoned personal property of unsheltered individuals without either pre- or post-deprivation notice that is reasonably calculated to reach the property's true owner and that explains to the owner a process to challenge the planned destruction.

B. Declare that Defendants' anti-camping ordinance and after-hours ordinance violates the Eighth Amendment, as applied to involuntarily houseless individuals who are engaged in the life-sustaining activities of sleeping, lying down, and/or resting with the use of blankets, cloth, or other movable sleeping implements in a Tucson public park during night-time hours on a night in which there are more houseless individuals than emergency shelter beds in the Tucson metropolitan area;

C. Award Plaintiffs reasonable attorneys' fees under 42 U.S.C. § 1988;

D. Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted this 17th day of January 2023.

Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
(520) 623-1922
*Attorney for Plaintiffs*